393 So.2d 372 (1980)
Linda W. PETERSON
v.
COLEMAN OLDSMOBILE, INCORPORATED et al.
No. 13840.
Court of Appeal of Louisiana, First Circuit.
December 15, 1980.
*373 Keith D. Jones, Baton Rouge, for plaintiff-appellee Linda W. Peterson.
Robert L. Kleinpeter, Baton Rouge, for defendant-appellee Coleman Oldsmobile, Inc.
Henry D. Salassi, Baton Rouge, for defendant-appellee General Motors Corp.
Richard Creed, Jr., Baton Rouge, for defendant-appellant Coachmen Industries, Inc.
Before LOTTINGER, EDWARDS and PONDER, JJ.
LOTTINGER, Judge.
This redhibition action arises out of the sale of a "Jimmy Mini" recreational vehicle to the plaintiffs, Nelson and Linda Peterson, by Coleman Oldsmobile, Inc. (Coleman). The plaintiffs originally sued Coleman, General Motors Corporation, the manufacturer of the cab and chassis of the vehicle, and Coachmen Industries, Inc., the manufacturer of the remainder of the mobile home. Coleman filed a third party demand against GM and Coachmen; and Coachmen filed a third party demand against GM and Onan Corporation, which manufactured and supplied an auxiliary generator plant to the recreational vehicle.
In written reasons for judgment, the trial court ruled in favor of the plaintiffs and against Coachmen Industries in the amount of $26,884.91. Of that amount $20,544.82 represents the purchase price and $6,340.09 represents interest paid on the purchase loan.
The trial judge's written reasons also allowed Coachmen a credit of $3,360.00 representing the plaintiffs' use of the vehicle calculated at $.15 per mile for 22,400 miles of use. The written reasons also gave the plaintiffs a credit for the defendant's use of the purchase price. The judge calculated the credit at 7% for a total figure to date of judgment of $4,022.01. An additional $1,250.00 in attorney's fees for the plaintiffs was allowed but plaintiffs' claim for mental anguish and inconvenience was rejected. Coleman was not cast in the judgment; rather, it was allowed indemnity for the full amount of judgment against Coachmen Industries. All other demands were dismissed.
It should be noted at this point that the final judgment as prepared by plaintiffs' counsel and signed by the trial court differs in some pertinent respects from the trial *374 court's written reasons. This difference plays an important part in one of the issues raised on appeal, and we will address this issue later in this opinion.
Coachmen brings this appeal from the trial court judgment alleging six specifications of error. For purposes of this opinion we adopt the following well-reasoned views of the trial court as our own:
"In early February, 1977, plaintiffs visited the showroom of Coleman Oldsmobile, Inc., for the purpose of purchasing a recreational vehicle. Coleman Oldsmobile, Inc. (hereinafter Coleman) is apparently an Oldsmobile dealer, but is not an authorized dealer for the truck division (GMC Trucks) of the parent company, General Motors. While there, plaintiff decided to buy a 1977 `Jimmy Mini' motor home. The `Jimmy Mini' reached Coleman in the following manner: (1) GMC Trucks delivered a chassis to Coachmen Industries, Inc.; (2) Coachmen constructed on the chassis a `living area', i. e., the recreational portion, and delivered it to Coleman, an authorized Coachmen dealer; (3) the local GMC dealer, Capitol Mack, invoiced Coleman for the chassis, and Coachmen invoiced Coleman for the recreational portion. The logo `GMC' appeared on the chassis, but the evidence is unclear as to whether that logo appeared on the recreation portion, or, if it did, whether GMC knew or approved of such use. Plaintiff paid a total of $20,544.82 for the vehicle; he was allowed a credit of $7,077.31 for a `trade in', paid $1,000.00 in cash, and financed the remainder, $12,477.51, through GMAC.
"Plaintiffs testified that at the time of the purchase, they thought they were buying a GMC product and would have a general warranty from that corporation. However, within less than 24 hours after the sale, they were presented with a number of warranty documents which clearly revealed to them at that time that GMC was warranting only the chassis. They made no complaint thereafter to GMC, Coachmen or Coleman about the limited warranties afforded in this case.
"Trouble with the vehicle began almost immediately. The plaintiff noticed that the thermostat on the roof air conditioner was not cooling properly, so he returned the vehicle to Coleman the morning after the purchase. At that time, he waited for more than six hours, but was then advised that it would be two weeks before he could be given an appointment to have the thermostat fixed. Plaintiff took the vehicle back home and used it, and then noticed that RV relay was not working.[1] When he returned for servicing he complained about the fact that the relay was not working, and was told that this type of vehicle did not have such a relay. Plaintiff continued arguing with Coleman about this, and the argument was not resolved until eight months later, when plaintiff obtained a copy of the owner's manual and through the use of the manual convinced Coleman that there was such a relay and that it was not working properly. During the interim, he could not run the recreational vehicle power plant and had to use jumper cables to start the electricity in the living area of the RV.
"In the interim, in March, he took the vehicle to Toledo Bend, and experienced substantial difficulties. The engine was skipping, the oil pressure was low and the vehicle burned an unusual amount of oil. The refrigerator quit working and all of the groceries were lost. In addition, the cruise control was not working properly. Plaintiff changed the plugs and returned the vehicle to Baton Rouge and to Coleman for service. Coleman then advised plaintiff that the vehicle would have to be taken to Capitol Mack for service on the chassis portion; this was done, and Capitol Mack kept the vehicle for about a week. The cruise control was repaired, and the advice of Capitol Mack was to drive the vehicle a while to see if the engine would `seal in'. The RV was then returned to Coleman for repair of the *375 RV relay and the power plant; although it remained there a week, neither was repaired. Upon discovering this, plaintiff immediately returned the vehicle to Coleman, but when he returned to check, no work had been done, and, in fact, Coleman had removed the battery and battery cable (apparently to supply some other vehicle) and had put in a smaller battery. After plaintiff called this to their attention, a new, larger battery was installed. Plaintiff took the vehicle home and apparently attempted some repairs of his own, but then took it back to Coleman, determined to leave it there until they were able to fix it. It remained there four weeks, at which time plaintiff regained possession. The power plant at this time was running better, but the problem with the RV relay had not been fixed, and the refrigerator was not working properly. The engine oil consumption problem still remained. It should be noted that at this time, there were only 3,000 miles on the vehicle; considering that there were 1,500 and 1,600 miles on the vehicle when it was bought,[2] plaintiff had been able to accumulate about 400 miles per month, including numerous trips to Coleman.
"Other problems had developed, however. Plaintiff was having difficulty hauling a boat with the RV, and the bottom rear of the RV was striking the roadway (`bottoming out') on less than level roads. For this problem, the vehicle was referred to Capitol Mack, and the GMC representative was called in. GMC had Capitol Mack `shim the coach up', i. e., raise the body. This satisfied the `bottoming out' problem, but made the vehicle less stable in handling.
"After these problems were taken care of, the `body' of the `living area' began to cause problems. Early leaking had been noted (in April or May), but by June the walls were `moving', cabinets were coming loose, and the leakage had reached a point at which some rotting and staining was occurring. Apparently, in late June, the vehicle was returned to Coleman for repair of these defects, together with repairing the RV relay. It remained there for about three months, during which some of the defects were repaired, but the replacement patches of the carpet did not match the initial carpet, and apparently nothing was done to correct the moving walls. After this, suit was filed to rescind the sale; Coleman thereafter made efforts to remedy some of the complaints, but apparently did not do so to the satisfaction of plaintiff.
"Suffice it to say that plaintiff was unable to average more than 400 miles per month during the first year, and at the end of that time, many of the initial defects had not been corrected. The court is of the opinion that the `Jimmy Mini' contained such defects that it was either absolutely useless or its use was so inconvenient that plaintiff would not have purchased it had he known of the defects, and that the defects existed at the time of the purchase but were neither known [nor] apparent to plaintiff. Thus the seller(s) are liable in redhibition, if it (they) were given an opportunity to correct the defects but were unable to do so.
"Coleman was the `seller', but this determination does not answer the question, for (1) the retailer seller may be entitled to indemnity from the manufacturer seller(s), and (2) the manufacturer seller(s) may be liable directly to the purchaser for redhibition. Thus the court must determine who was the `manufacturer-seller' in the instant case.
"Quite naturally, GMC accuses Coachmen, and vice versa. However, we are unable to hold GMC liable as the manufacturer-seller of the entire unit, for these reasons: (1) viewed objectively, its role was more that of a seller of a component part; (2) Coachmen had exclusive control of the way in which the GMC component would be used, and (3) the use of the GMC emblem was either restricted to the component (the *376 chassis) or was used beyond the chassis without the knowledge or consent of GMC.[3]
"The court also is not convinced that any belief by the plaintiffs that GMC was the warrantor of the whole unit was a motivating factor in their purchase. They learned within 24 hours after the sale that GMC warranted only the chassis, but they made no protest, and plaintiff admitted candidly that they probably would have bought the RV even if they had known that GMC did not warrant the entire unit.
"Thus if GMC is liable at all, it is as manufacturer-seller warrantor of the chassis. In this respect, GMC was given only two opportunities to repair the defects attributable to the chassis. On one of these occasions, GMC reasonably believed it had solved plaintiff's problems, and the plaintiff never did return the vehicle to GMC's dealer, Capital Mack, for further repairs. On the second occasion, GMC did all that it could to alleviate the problemthe weight distribution problembut (a) this defect was not attributable to GMC, and (b) under the circumstances, GMC could do no more about it than it did. The court does not believe the chassis was defective.[3A] Under these circumstances redhibition against GMC should not be permitted.
"Onan was the manufacturer of the generator in the recreational vehicle, and has been third partied by Coachmen. However, the only complaints in the pleadings about the auxiliary generator manufactured by Onan was that (1) it was hard to start and (2) it made a knocking noise. No evidence was offered to prove the second complaint, and as to the first complaint, the evidence revealed that there were two starters, the panel (remote) starter inside the living area, and the direct starter, outside on the generator, and the panel starter was the only one which was defective, and that this starter was manufactured by Coleman (sic) [Coachmen]. Under these circumstances, Onan is not liable, and the third party demand should be dismissed.
"This leaves as remaining defendants Coleman, the retailer-seller, and Coachmen, the manufacturer-seller. The court is of the opinion that the defects which made the vehicle uselessthe lack of an RV relay, the defects in the frame of the `living area', the `overloading' of the rear end of the chassis, and the defects in the power plant and refrigeratorare attributable to both defendants. Under these circumstances, both should be cast for the damages plaintiff has sustained. However, CC Article 2531 provides in relevant part that:
In any case in which the seller is held liable because of redhibitory defects in the thing sold, the seller shall have a corresponding and similar right of action against the manufacturer of the thing for any losses sustained by the seller.
Under this article, Coleman is entitled to indemnity over against Coachmen. Coachmen argues, however, that under the jurisprudence [Daigle v. Robinson Brothers, Inc., 268 So.2d 186 (La.App. 1st Cir. 1979) and Perrin v. Read Imports, Inc., 359 So.2d 738 (La.App. 4th Cir., 1978)] the court should deny indemnity because Coleman failed to properly repair the RV. As the court understands the cases, the `estoppel to claim indemnity' against the retailer applies only where the defects are easily remediable or are caused by the repairs. While the repair work in this case was clearly unsatisfactory by any standard, the defects arose out of *377 the manufacture of the product and were probably impossible to remedy. For example, the `overloading' or improper weight distribution of the living area on the chassis simply could not be corrected; in the like manner, the defects in the frame were not easily repairable.[4]
"The court is hesitant to deny the retailer's right to `recover over' against the manufacturer, clearly granted by the legislature, beyond that which is compelled by the decisions of higher courts. In this case, where the defects which the retailer failed to correct were minor, and the major defects which support the redhibition were not reasonably remediable by the retailer, indemnification will be granted."
Coachmen claims the trial court erred:
1. In granting Coleman indemnity against Coachmen;
2. In not holding General Motors liable for defects in the components it manufactured;
3. In not holding Onan responsible for the defects in the power plant;
4. In finding that the defects complained of entitled plaintiff to rescission of the sale of his motor home;
5. In admitting hearsay evidence; and
6. In granting plaintiff a credit for defendants' use of the purchase price.
We will address these specifications one by one.

COLEMAN'S INDEMNITY AGAINST COACHMEN
While we certainly agree with the trial court's finding that Coleman's repair attempts were often unsatisfactory and even sloppy at times, the court's conclusion allowing Coleman indemnity against Coachmen is supported by the law and jurisprudence of this state. La.C.C. art. 2531 gives the seller who is held liable because of redhibitory defects a corresponding right of action against the manufacturer for any losses sustained by the seller. A review of the list of defects quoted in the trial court's opinion above will show that most of the major problems complained of by the plaintiffs were problems resulting from the manufacture of the Jimmy Mini motor home by Coachmen. While Coleman was not a good faith seller in the sense that the dealership had knowledge of some of the defects prior to sale, knowledge of these redhibitory defects alone does not abrogate Coleman's right to indemnity under Article 2531. Millin v. Dawson, 387 So.2d 1213 (La.App. 1st Cir. 1980). Coachmen cites Bagwell v. Coleman Oldsmobile, Inc., et al., 391 So.2d 1260, No. 13432 on the Docket of this court, wherein Edwards, J. as the organ of the court, affirmed a trial court decision which disallowed indemnity. Bagwell is distinguishable. There, the trial court found that the defects for which redhibition was granted were not attributable to the manufacturer. In the case at bar, the major defects found by the trial court, particularly the overloaded rear end, were directly attributable to the manufacturer.

LIABILITY OF GENERAL MOTORS
As shown in the trial court's opinion, General Motors' connection to this vehicle was through the cab and chassis GM manufactured. As we see it, the only defect which could possibly be considered hidden and redhibitory as concerns GM is the excess consumption of engine oil. However, as the trial court found, this problem seemed to have more to do with the sealing in of the engine than with any kind of defect in the engine. The cause of the motor home "bottoming out" on the road appears to have been the oversized and overweight coach placed upon the chassis by Coachmen.

ONAN'S LIABILITY
The preponderance of the evidence in this case shows that the problems with *378 the power plant manufactured by Onan Corporation occurred as a result of faulty switches installed by Coachmen and not as a result of any defect in the manufacture of the power plant. We agree with the trial court absolving Onan of liability.

SUFFICIENCY OF DEFECTS TO MERIT RESCISSION
Under Article 2520 of the Civil Code a buyer is entitled to rescission of a sale if the vices or defects in the thing sold render it either absolutely useless or so inconvenient and imperfect that it would be assumed that a buyer would not have bought it had he known of the defects. Our thorough review of the pleadings and transcript in this case convinces us that had the plaintiffs known of the hidden defects afflicting this motor home prior to the time they purchased it they would not have bought the unit. The motor home was often absolutely useless for its intended purpose or its use was so inconvenient and imperfect that the plaintiffs would not have purchased it had they known of the problems with which they would be faced. The malfunctioning RV relay, the defects in the frame of the living area, the overloading of the rear end of the chassis, the defects in the power plant and refrigerator and the numerous other lesser defects complained of by plaintiffs were of such magnitude as to allow plaintiffs to rescind this sale.

HEARSAY EVIDENCE
Coachmen contends that the trial court erred in allowing the plaintiff to identify figures he saw on a weight receipt shown to him by an employee of Coleman. The court allowed the plaintiff to testify as to the weight figures, concluding that Coleman's employee had adopted the weight figures as his own. The admission of a party opponent is one of the exceptions to the hearsay exclusionary rule. The evidence was thus admissible as to Coleman. Coachmen contends on appeal, however, that the trial court used this hearsay evidence against Coachmen in finding that the rear end of the motor home was overweight and that the weight problem was caused solely by Coachmen. Coachmen's prime objection is that hearsay evidence should not be used against Coachmen unless it is shown that Coleman was acting as Coachmen's agent in this regard.
While our review of the record shows that Coleman arguably was acting as Coachmen's agent for warranty repairs of Coachmen products, we need not decide whether Coachmen's hearsay objection has merit. Other evidence in the record shows that the weight problem which resulted in the unit bottoming out on the highway was caused solely by Coachmen's placement of the living unit on the chassis. Even if the trial judge incorrectly admitted hearsay evidence, we cannot find that he relied on it in deciding this case.

USE OF PURCHASE PRICE
In its final specification of error, Coachmen contends the trial court erred in allowing the plaintiff a credit for the defendants' use of the purchase price. Coachmen claims the plaintiff is entitled only to legal interest from the date of judicial demand. Double recovery would result, Coachmen says, if the plaintiff is given a credit for the defendant's use of the purchase price. While we see some merit in the defendant's contention in this regard and will discuss our views thereon below, this discussion will necessarily be dicta for reasons hereafter explained.
As indicated at the outset of this opinion the trial court in written reasons awarded the plaintiff of $20,544.82 for the purchase price, $6,340.09 for finance charges and $4,022.01 for the defendant's use of the purchase money. The trial court also gave the defendant a credit of $3,360.00 representing the plaintiff's use of the recreational vehicle. However, the final judgment as prepared by the plaintiff and signed by the trial judge does not conform to the trial judge's written reasons. The $4,022.01 allowed to the plaintiff by the trial court for the defendant's use of the purchase price is not mentioned in the final judgment. Instead, the two paragraphs in the final judgment *379 pertinent to this discussion read as follows:
"IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant, COACHMEN INDUSTRIES, INC., be granted a credit for use of the vehicle in the amount of THREE THOUSAND THREE HUNDRED SIXTY AND NO/100 ($3,360.00) DOLLARS.
"IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant, COACHMEN INDUSTRIES, INC., be ordered to pay unto Plaintiff the sum of SIX THOUSAND THREE HUNDRED FORTY and 09/100 ($6,340.09) DOLLARS representing interest paid by Plaintiff on the chattel mortgage together with legal interest on the sum of TWO THOUSAND EIGHTY AND 09/100 ($2,080.09) DOLLARS representing a difference between the interest paid by Plaintiff on the chattel mortgage note and the credit to which Defendant is entitled from the 21st day of November, 1979."
At the outset, it is apparent that a mathematical miscalculation was made in subtracting the credit for use ($3,360.00) from the finance charge ($6,340.09). The difference is $2,980.09, not $2,080.09 as stated in the judgment. Be that as it may, we think the trial judge erred in calculating the award for use of the purchase price by the defendant.
Plaintiff was awarded $6,340.09 which represented the finance charge on the $12,477.51 loan he obtained from GMAC to pay for the vehicle. This was the expense the plaintiff incurred to use GMAC's money to buy the motor home. By requiring Coachmen to pay this sum the court has fully compensated the plaintiff for the defendant's use of this portion of the purchase price. There is, however, another part of the purchase price, i. e., the $1,000.00 cash payment and the $7,077.31 trade-in representing a total downpayment by the plaintiff of $8,077.31. The defendant should rightfully pay the plaintiff for the use of this portion of the purchase price at 7% per annum from the date of purchase until the date of final judgment. See Smith v. Max Thieme Chevrolet Company, Inc., 315 So.2d 82 (La.App. 2nd Cir. 1975).
As the final judgment now stands, Coachmen is in a better position than it would have been had the trial court's written reasons been followed or if our views were incorporated into the final judgment. The plaintiff has neither appealed nor answered the defendant's appeal. Thus, we cannot amend the judgment to Coachmen's detriment.
Therefore, for the above and foregoing reasons, the decision of the trial court is affirmed at the costs of Coachmen.
AFFIRMED.
NOTES
[1] "The RV/Relay apparently is a small but essential part of a recreational vehicle. As the court understands it, the relay permits the user to `charge' the living area battery while the vehicle is being operated on the highway, but then to avoid `draining' the vehicle battery when the vehicle is parked and living area is being used."
[2] "The distance from Coachmen's factory in Indiana to Baton Rouge; the vehicle apparently was driven to its destination for resale."
[3] "The evidence is in conflict on the consent of GMC to the use, if any, by Coachmen of the GMC emblem on the portion of the RV manufactured by Coachmen. The court notes that there is evidence in the record that Coachmen obtained GMC's permission to use the term `Jimmy' in `Jimmy Mini' on the theory that `Jimmy' might be a trademark infringement on `GMC'. While not directly relevant to this suit, this tends to prove that Coachmen did not believe it had the right to use GMC on this finished `Jimmy Mini' without GMC's express consent. This, in turn, negates Coachmen's right to use `GMC' anywhere on the portion of the RV which is constructed in the absence of proof of such right, and none was offered by Coachmen or plaintiff."
[3A] "The court is of the opinion that the evidence also fails to establish the existence of any defects in the chassis engine, but merely initial difficulties before the engine was `broken in'."
[4] "The defect resulting from improper weight distribution of the living area on the chassis could not be corrected short of rebuilding. Similarly, the `warping' of the frame of the living area could not be corrected, as new movement would cause it to go back out of line."